[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
Appearances:
For the Plaintiff:
ROBERT CLARK, ESQ.
For the Defendant:
MARIO MIKOLITCH, ESQ.
For the Minor Child:
RICHARD DIXON, ESQ.
 Tracey L. Whidden Court Reporter CT Page 9711
THE COURT: All right. The Court has heard all the evidence, has reviewed the exhibits, the financial affidavits of the parties and makes the following findings: Parties were married on May 11, 1970 at Bridgeport, Connecticut. All jurisdictional requirements have been met. The marriage of the parties has broken down irretrievably and the same is hereby dissolved. The Court finds on the complaint on the ground of irretrievable break down.
The parties are the parents of three minor children. There are two adult children. There are three minor children born issue of the marriage, Matthew Arnold born June 3, 1982, Mark Lawrence, October 29, 1984 and Stephanie Kaitlyn born April 1, 1991. No other minor children have been born to the defendant since the date of the marriage.
The mother and minor child, Stephanie, have been recipients of State assistance during the proceedings. While it is normally true that the pendente lite motions for alimony and child support would be merged as of the date of the final hearing, the Court specifically is not going to rule regarding any arrearages that may be due to the State of Connecticut because I have to tell you that it is unusual for them not to have appeared, nor sent anybody at any time during the proceedings with some message of what they are interested in. And so I believe that there may have been an error regarding notice and if there was an error regarding notice, I'm going to leave that open and refer those matters. So I enter no finding regarding those. I specifically reserve the jurisdiction of the support magistrates hearing to deal with any matters of the arrearages due and owing to the State of Connecticut, if there are any.
While I have heard evidence regarding both the incompatibility and difficult nature of the marriage, the marriage of the parties remained intact in whatever form it existed until the marriage and the family itself fractured over the allegations that Stephanie had been sexually abused by her father and perhaps her brothers. Her mother made these allegations after she claims that Stephanie had related incidents of sexual contact with her father. DCF and the police investigated. The child was examined at Backus Hospital. There was no physical evidence, nor abuse or trauma upon medical examination and DCF did not substantiate abuse. Though unsubstantiated in the terminology of DCF, which does not necessarily mean that it didn't happen, just that they can't CT Page 9712 substantiate it.
The child and mother were referred by DCF to United Services for evaluation and therapy, if necessary. The psychotherapist who worked with the mother and child testified here and reported similar to other reports, though there are varying reports by the mother to different people about how the allegation came to be, that the abuse report originated after Stephanie shared with the mother's friend Marie that she had dreamed of a black wolf with a pink face and then Marie, who apparently has some background in sexual abuse, according to Ms. Sagen, told Ms. Sagen that this meant abuse. This is at least what she told Ms. Cane. Dr. Mantell reported that Marie said, there is something going on, but I'm not going to tell you what it is. You're going to need to find out yourself.
On different occasions Ms. Sagen did speak to the child, not so much directly asking her if anything had happened, but sharing with the child her hope that no one had touched her and the child in response to the mother's conversations regarding her hopes or fears did report, according to Ms. Sagen, that her father had touched her inappropriately during a nap. Dr. Mantell, DCF and Ms. Cane and the police all felt that the report of sexual abuse was contaminated by the time any of them heard it. They were unsure whether the child was in fact saying something that had happened or was repeating words that she had heard her mother or her mother's friends say because the child had in fact been spoken to regarding the incident and/or Marie's report of a dream by her mother and other members and other friends of her mother. And thus it became unclear what was actually going on.
Both Dr. Mantell and Ms. King though suspect that abuse did not occur for a number of reasons; number one, the statements given were inconsistent, the mother's statements were inconsistent; the child used language in her statements which was not a child's language. She used adult terms and adult language beyond the vocabulary of a three-year old thus further implying that her statements had been contaminated by other people speaking in front of her. In addition, she showed no physical trauma, which is not necessarily conclusive, but she also showed none of the other characteristic symptoms associated with children who have been the victims of child abuse. Her bed wetting was considered to be normal and in fact preexistent to the sexual abuse complaint or allegations. She appeared to be in good enough shape that Ms. Cane, the therapist who testified here CT Page 9713 and who the Court found to be a credible and accomplished individual, felt that there was no need for therapy and while not wanting to disbelieve the child felt that, and while there was smoke I think she admitted, it's clear from her testimony that she didn't believe there was any fire. She released the child from treatment feeling that there was nothing to be done.
In his evaluation, Dr. Mantell felt that it's unlikely that there was abuse that had occurred and that this was more likely projection on the part of the mother and had to do with her own history and fears which she was not forthcoming about with Dr. Mantell but in fact was inconsistent. It is absolutely clear in Dr. Mantell's report that sexual abuse is a major issue in mother's own personal history though she is not forthcoming about its nature or the people who perpetrated it, not that she needs to be, but that it's there and that there is some projection Dr. Mantell feels between what happened to her and what she fears for her daughter. It's interesting to note, and it boarders on Dr. Mantell's opinion, that the mother also believes that her eldest daughter, despite her vehement denials and the denial of her husband, was also sexually molested by the husband and she believes this because at a time when there were no sexual relations occurring with her husband he was buying presents for the daughter and not for her. There are any number of family dysfunctions or pathologies which can give rise to that scenario which have absolutely nothing to do with sexual abuse, but it is interesting to note that that is the explanation of choice for Ms. Sagen. And it again goes to support Dr. Mantell's feelings that there is nothing going on here; that it has to do with projection rather than with actual occurrences.
There is insufficient evidence before this Court to find that sexual abuse occurred. I have to be able to find that it may have occurred by a fair preponderance of the evidence and I can't do that based on the evidence I have heard. The allegation itself has undone the family. These allegations are like hand grenades. Once you say them they can't be taken back. Children are subjected to what I think of as the bulldozer of the Department of Children and Families which if children are actually being abused is impact to their assistance but if they're not the children learn all kinds of damage and difficult things. They learn that they have immense power through their actions to manipulate and in fact foretell the lies of their parents and this has in fact happened in this case. CT Page 9714
Stephanie has already used the power that she learned that she could wield to make comments serious enough about her mother to Dr. Mantell that he had to, as a mandated reporter, call DCF though he knew or believed that he and the mother were being manipulated by Stephanie. This is a serious turn of events. So we have two boys who don't want to have anything to do with their mom because they feel that they have been accused of and betrayed and we have a child who has become through no fault of her own, because I'm sure she's a darling little girl, basically she's learned kids and power is a dangerous mixture and she's learned that she has power. And so in fact she's been caught by the allegation between her mother and her father and has become both manipulative and protective interestingly enough of her mother whose frailties I think she knows all too well and so she uses both to manipulate and she's very loyal and attached and in love with and protective of her mother. She's less protective of her dad because I think she realizes that her dad does not appear to be someone who is in need of protection. She does a pretty good job of manipulating him, at least her brothers think so.
The mother has reported that the father has been, throughout the marriage, an angry and emotionally abusive person. Dr. Mantell confirms the anger and feels that it is necessary that the plaintiff seek assistance in learning to manage that anger since he is at least going to have custody of his two sons. While I, under the Connecticut law, cannot order anybody in to counseling or therapy, I urge you to take Dr. Mantell's suggestion because anger is one of those things that we can learn to manage and if it gets in the way in any of our relationships even for an instant it's worth learning how to manage. It is the fear.
Well, let me also concur with Dr. Mantell's observation that these are two people who, if you look, who did not appear to be well matched yet they have stayed together in one way or another, made a marriage work, raised two adult children who seem to be adjusted and contributing members of society. So it couldn't have been all that bad. Two people had to be able to do this and I get the sense that there was a commitment above all else to their children. The children report that their parents fought a lot and it appears that they have learned in ways to tune it out, so I believe that it was a household — and one of the neighbors reported to the family relations officer, a neighbor that they had years ago, that they fought like cats and dogs. So I believe that it was an emotionally charged, loud volatile situation and CT Page 9715 given the nature of their personalities I can believe that whether intended or not by Mr. Sagen, Ms. Sagen would perceive the anger directed at her as belittling and that Mr. Sagen would perceive the anger back at him as a certain degree of ungratefulness and lack of appreciation. Because I think both of these people were working hard to take care of their kids and underneath all of the differences there was a shred, what Dr. Mantell's report does not tell us but I believe existed, that there was a shred — what kept them together was the shred of respect for what each other was actually doing for their family.
These are people who come from a generation where you didn't leave because it was tough. You stayed. You certainly didn't leave if you had kids because it was tough. You stayed. And whether you got along real well or not, your pleasure and happiness was secondary to the kids' well-being, and I think that Ms. Sagen knew that Mr. Sagen worked hard to put food on the table and to keep a roof over their heads and respected him for that and that he understood that she too was trying her best to take care and love the children and that's what kept them together despite all the anger, despite the fighting, despite the lack of being able to find a way to accommodate each other in terms of their differences.
The father and the adult children report that the mother is over involved in her religious activity to the neglect of the children. The younger boys say the same thing telling some rather alarming stories of dangerous activities that they engaged in while unobserved or ignored by their mother while she was in prayer. I want to be perfectly clear for the record that whatever Ms. Sagen's religious beliefs or her fervor she is entitled to that. This is the United States of America. People have a Constitutional right to observe and practice their religions and I'm not concerned about her practice of religion. And I believe that the issue of religion is somewhat of a red herring in this case because it is not the practice of the religion but the care of the children which is what the Court focuses on and it is clear from the evidence before me, through the reports, that there are times when the children have gone unattended and I don't know that this is due to religious fervor or fanaticism.
Dr. Mantell makes clear in his report, through his testimony that it is not the religious fervor of the defendant which is problematic but it is her psychological difficulties that she has, real diagnosable psychological difficulties, which interfere CT Page 9716 with her ability to make sound judgments around the rearing of her children and sometimes to have adequate reality testing and this could just as easily as anything else explain some of the lapses in attention to the kids which the children themselves describe. Now, it's easier to blame it, certainly more clear in black and white, to blame that lack of judgment on an attention to religion as opposed to an attention to the kids, but I think that that would minimize and disregard Dr. Mantell's findings which to the Court are the most significant part of this litigation.
Mr. Mikolitch has made great issue of the fact that the mental stability of the parties was asked to be evaluated, but for the Court it is the most important issue before it because it is that which is a prerequisite to the rearing of children with stability, with judgment and with good care. Each of the parties in terms of Dr. Mantell's report presented certain difficulties, anger management on the part of dad and far more serious psychological problems on the part of mom. Given the comparative problems described by Dr. Mantell, despite the shortcomings perhaps as a husband and perhaps despite the shortcomings in terms of anger or some of the judgment regarding alcohol or women, and I will talk about that in a minute, that Mr. Sagen may have shown in the view of his wife, he is at this time today more able to present a stable home environment for the kids and that has been born out by today's amazing testimony.
To me, Ms. Sagen, it is absolutely amazing that faced with a custody battle over your youngest child living in an environment which supported you, which wrote letters on your behalf, that you would choose on the last day of testimony to reveal that you were moving, you don't know where, and maybe by next Tuesday, shows a significant lack of either judgment or a true desire on an unconscious level to not have Stephanie in your custody, one or the other, and I'm not going to try to guess which, but most people in the midst of custody fights fight tooth and nail, as you did for a long period of time, to provide a stable living vicinity because it's basic, the safe roof over somebody's head and food on the table are basic and you fought under dire circumstances, terrifically hard to obtain that and you did. Yet here we are at the moment of decision and you've undone it and you've undone it not for any personal need. You've been doing fine. You've undone it for others, for some what appears to me yet vague and unarticulated in terms of the evidence, feeling that you need to come to the rise of somebody else's defense. CT Page 9717
Now, I'm not going to fool you or say to you that because you did that you're going to lose custody of your child. The evidence to me in Dr. Mantell's report is substantial enough that I would have awarded custody of all three children to Mr. Sagen anyway, but it underscores to me some of the lack of either reality testing or lack of judgment that Dr. Mantell talks about that you can put yourself in that situation simultaneously with the end of this case. So what we are left with is, at the current time, not only is the defendant, I believe, suffering from enough psychological impairment that it affects her ability to deal with Stephanie and Stephanie's needs as opposed to the defendant's, that is Dr. Mantell's testimony regarding the projection and the mixing of needs that shows up in terms of keeping that last appointment where the child was to be evaluated with her father. It shows up in the outrageous control that Stephanie is now exhibiting over her mother; the incident described at the McDonald's and the incident described at the store are of a child who is not being controlled, nor disciplined by the parent. And for those reasons I'm going to award custody of all three children, three minor children, to the plaintiff Mr. Sagen.
Now, Mr. Sagen; the testimony has revealed that there's been enough of a problem with alcohol in Mr. Sagen's life that he's sworn off drinking from time to time. I don't know anybody who doesn't have a problem with alcohol that swears off drinking. Only people who have problems with alcohol swear off drinking. The rest of the people who don't have a problem would never think of swearing off drinking because it doesn't present enough of a problem to go, Oh, my God. I'm drinking too much. I don't know what the status of your relationship with alcohol is at the present time. The evidence is unclear to me but I worry about people who have had histories of alcohol problems or abuse drinking at all because for many of these people one drink is too many and a thousand isn't enough. People can only control their drinking for so long and I'm a little bit concerned about the fact that you're taking up a relationship with a woman who works at a package store, but that may just be a coincidence. So I urge you, again, I cannot order you, I am going — what I can order, I can't order you to treatment, but I can make the custody award contingent upon your sobriety and I am going to make it contingent upon your sobriety. That doesn't mean you can't drink at all. It means you have to be sober. So you can't drink to excess and you have to drink like a normal person might drink which is occasionally or socially at best. CT Page 9718
Normally, I have to tell you that I'm one of the judges who does believe that there is a qualitative difference between children being exposed at the age these children are to relationships in which people are living together in a committed marital relationship and those in which people sleep together or live together casually. I think it has an affect on kids. Kids today live in a very dangerous world. For children today sex can be lethal and so for children to believe that sex is casual and does not belong inside of long-term committed marital relationships can be very dangerous in this day and age. And so I think there is a lack of judgment in terms of carrying on one's social life with the kids and in front of the kids. The problem is, is that the system has not addressed this case for three years and so we might be able to hold people to a great standard in a year or maybe in 18 months but life goes on even if the legal process does not. And so while I don't think it's a great idea, and I note that in my record, I don't think that I'm going to — I'm not going to micro manage people's lives and I'm not going to tell you that they cannot have sexual relations with people and other parties while their children are around. I do at pendente lites all the time. It wasn't an order entered in this, but I'm about — I'm dissolving the marriage today, and so I just ask you to remember that when you have these kids under their roof, they have a completely — they learn from watching you, number one, and they take a long time to adjust to things and they want very much to please you, so just take all those things into account.
Visitation is awarded to the defendant in accordance with the recommendation of the family relations office regarding the concerns for stability. Ms. Sagen under circumstances worse than this was able to provide always a roof, maybe not the best of roofs, but a roof over Stephanie's head. She has a wide circle of friends and I am not going to assume that because she is leaving the place where she is living that everything is going to fall apart next week. I think she has a number of resources and people who will assist her. So I'm not going to limit the visitation. Should it become problematic people can move to cease the visitation, but I'm not going to assume that it is because I think that this is going to be a difficult transition for mother and for father and I want to make sure that there is as much available time as possible, so I'm not going to buy the problem that doesn't exist today. If it becomes one, people can go into court and deal with it or they can deal with it informally, but CT Page 9719 I'm going to award visitation in accordance with the family relations office and that is incorporated by reference in my decree. We're going to attach it to the transcript.
Regarding child support, I'm entering no order of child support from Ms. Sagen to Mr. Sagen. She is barely above the low income obligator cut-off. Given the fact that she has made little or no claim to personal property, given the fact that her housing is up in the air it would be inequitable and unfair to burden her with the child support order at this time because she's going to — need any monies for transition. She needs to be able to do that to provide a safe visiting environment for Stephanie, and so it is in Stephanie's best interest that that deviation from the child support guideline be made.
Regarding Mark and Matthew, custody of Mark and Matthew is awarded to Mr. Sagen. Reasonable rights of visitation are awarded to Ms. Sagen either in a therapeutic setting, if necessary, or if the children want to visit her somewhere else, fine. But she should initially begin on a weekly basis in a therapeutic setting. I would encourage Stephanie to be part of that on occasion in a therapeutic setting for purposes of transition and that therapeutic setting would end at a time when the person who is giving the therapy feels that it's appropriate for it to end or upon motion to the Court by the parties by order of the Court that the parties feel that it's going on unnecessarily and the therapist is not making a good decision.
Does your client have medical insurance for the children through his employment?
MR. CLARK: Not yet. It takes 90 days, your Honor.
THE COURT: That's what the thing on the affidavit meant. All right. The defendant is ordered to maintain medical insurance as it is available through his employment for the benefit of the minor children.
MR. MIKOLITCH: You mean the plaintiff?
THE COURT: The plaintiff. I'm sorry. Is there a cost associated with it?
MR. SAGEN: Yes. I have no idea. I haven't got the figures. CT Page 9720
THE COURT: Okay. In terms of alimony the case is particularly problematic. I believe that Ms. Sagen needs an alimony award but Mr. Sagen is taking custody of three children and every dollar out of the house for Ms. Sagen is a diminished amount of child support available. I am though going to award a modest amount of alimony in the amount of $20 per week. The only thing I can tell you right now is that you're over withholding on your Federal income, Connecticut State income tax, with three dependents and head of the household status. Your income taxes are probably — they're considerably lower than what — your lawyer can help you figure that out. The alimony award will lower them even more.
Regarding the property, the parties are joint tenants on a lease purchase agreement with Habitat for Humanity of Southeastern, Connecticut. I believe that's the name of the organization. Let's just call it Habitat for Humanity. It is clear that it is still in force and effect. It originally existed for a term renewable on a month-to-month basis. It's still going on a month-to-month basis. It allows for the purchase price of $57,000 for the condominium with the down payment of $1,100 at some time as it becomes available and Habitat for Humanity figures out how to get it done. If Mr. Sagen purchases the home, that is, should he become the owner, these are the orders I'm entering. All right. Title and interest in the lease purchase agreement is awarded to Mr. Sagen. In the event that he purchases the home under the lease purchase agreement he shall at the time of the closing execute a mortgage. He shall after judgment execute a note, but at the time of the purchase agreement a mortgage giving Ms. Sagen a 30 percent interest in any equity which accrues to his benefit under that lease purchase agreement. For instance, right now if it happened today he would get 40 percent of the net proceeds; so let's say 40 percent of the net proceeds was $10,000. Ms. Sagen would get 3 and he would get 7, and the reason that I am making that distribution in that amount is that I want to give recognition for all of the efforts and contributions into the acquiring of that property which Ms. Sagen gave to the efforts into the family, all of her financial and non-financial contributions. This was going to be the payoff and the marriage has ended before the payoff is realized in fact, but on the other hand it would be unfair to give her an equal interest because all of the equity that is being accrued is being done without her contribution from the date of separation and that is Mr. Sagen is totally responsible for the rent and/or mortgage, upkeep maintenance and he's providing the home for the kids. CT Page 9721
Regarding the IRA accounts. The IRA accounts are divided 60 percent to Mr. Sagen, 40 percent to Ms. Sagen. Any documents, including the qualified domestic relations order or directions to a controlling administrator or bank shall be prepared by counsel for Mr. Sagen and presented to the Court for signature. The attorney for the minor child is awarded counsel fees in accordance with the State schedule and he can present the forms, the appropriate forms, to me and I will sign them for forwarding to the State. Each of the parties is responsible for their own counsel fees. The only assets out of which counsel fees could be paid at this time will be early withdrawal of the IRA and I divided the IRA so each party is responsible for their own counsel fees.
Just a couple of other things while I clear up in terms of things that were argued. There is no evidence before me of any conspiracy on the part of the DCF worker, Ms. Korenkiewicz, to rig the investigation in favor of Mr. Sagen because he happened to be an acquaintance of an uncle who she would not recognize walking down the street. That's the only evidence I have and while it's great for conspiracy theorists, it's not sufficient for a court.
I am hopeful, I have to tell you, that this is a sad and terrible case as far as I'm concerned because this is a family unit that had hung together in spite of many obstacles and was truly undone in a very destructive way and I truly believe not through any vengeance or vindictiveness or mean spirit in this. I believe Ms. Sagen is sincere in her belief in her child and somewhat influenced by the strong and unfortunate beliefs of her friends perhaps that gave strength to those. If the therapist for the children, the person who's doing the therapeutic visits once a week, if that person believes there is any therapeutic value for the children to having Mr. or Ms. Sagen come in and join in those visits in order to in any way heal this family, then they are ordered to do so at the request of that therapist.
Ms. Sagen, you don't have to look. I know that you're distraught and you are upset. The courts deal in making decisions where one party is a victor and one party appears to be the loser. That's not how families work though and it's not how children love their parents. Children for the most part don't much care where they live so much as what the contact and the quality of the relationship is with both of their parents. There CT Page 9722 is a world full of visiting fathers out there who will tell you that they have strong, deep connections to their children because they forge them and because the children are smart and they know who loves them. So the fact that you are not going to have physical custody of Stephanie means less than at this moment you believe it does in terms of Stephanie's love for you, your love for her and your ability to be a warm and guiding influence in her life.
I urge you as I urged Mr. Sagen, in terms of getting some assistance for the problems that have become apparent through the evaluations done in this case, I urge you to seek psychological or psychiatric assistance. I think that you're a lovely, warm-hearted, kind woman who is crippled by old pain and you're 51 years old and you have a long life to live and a little girl who needs you to be well, and so I urge you to get some assistance. I promise you that once you say things out loud, whether you go and you get help and you say things out loud and you admit them so that you can hear them, it's the beginning of making them better. We are only as sick as the secrets that we keep. I urge you — you have great faith. You have great faith. And I urge you to trust in your spiritual life as well to let yourself be healed with some help.
To Counsel, I thank you all very much for handling a difficult and painful case with dignity and dedication to your clients and I think that the case was presented vigorously. You fought well without sacrificing their feelings and your compassion is appreciated.
If I didn't dissolve the marriage the marriage is hereby dissolved. The alimony award is subject to Connecticut wage withholding payable directly to the payee. Unreimbursed medical expenses are to be divided between the parties equally. Should Ms. Sagen be able to obtain employment in which there is cheaper medical insurance than Mr. Sagen, is comparable, then she is ordered to maintain the medical insurance.
Is there anything else I've left out, Counsel?
MR. CLARK: My client awarded alimony for the record?
THE COURT: I'm sorry. I did intend to award your client $1 a year. CT Page 9723
MR. CLARK: I don't think there's anything else.
MR. DIXON: I don't think, your Honor. Thank you.
THE COURT: Anything else?
MR. MIKOLITCH: What was that, your Honor?
THE COURT: Anything else? I did award Mr. Sagen $1 a year alimony as well. I should just say in terms of the alimony, in terms of the alimony award, it is payable to the plaintiff or the defendant or the State of Connecticut as their interests may appear. We're adjourned.
THE SHERIFF: All rise.
MR. CLARK: Thank you very much, your Honor.
THE COURT: You're welcome. I did forget something, Mr. Mikolitch. I'm sorry. I need to give you a — we need to set up the change. And what I intend to order is that the custody — when would the next visitation normally be?
MR. CLARK: He's visiting I think today, your Honor.
THE COURT: I think that the best way to do this is to just have it done. I don't think there's any good way to lead up to this. So if she's already in with Mr. Sagen today, she's going to remain there. First visitation will be next Friday.
MR. CLARK: Not tomorrow?
THE COURT: Not tomorrow. Next Friday. I want to give her — and there can be — I suggest one visitation, not — instead of two visitations next week, one afternoon next week. I think it's important that Stephanie settles down and try to get stabilized and not have too much interruption and then go for the visits and I think that the week will be sufficient for it. I think she's relatively resilient.
MR. MIKOLITCH: Could I have her come in and would your Honor repeat that in front of her?
THE COURT: Sure. If you have her come in. CT Page 9724
MR. MIKOLITCH: Thank you. She asked to go to the ladies room.
THE COURT: Yes. Has somebody picked Stephanie up at school and is taking her to Mr. Sagen's house or is she going to be picked up? It's 4 o'clock now.
MR. SAGEN: She has already been picked up, your Honor.
THE COURT: Okay.
MR. DIXON: Your Honor, I expect to address the issues with the boys with regard to the therapy. Obviously that is going to take a little time to get in place, but I'm sure they will work on that as quickly as possible and I probably will have to meet with them to explain. They are rather determinative themselves but to this point they have worked well and they've worked with me on that a number of times so I think we'll be able to get things off on a positive foot but it may take a little while.
THE COURT: If you need to make arrangements that is fine. It needs to be done as expeditiously as possible. That's all.
MR. DIXON: And hopefully Rebecca Pozner [phonetic] is still available. I know she was possibly moving to another job when I last spoke to her but she is — and that will be easy because we can have no transition, otherwise we may have to find someone who will work —
THE COURT: It's obviously best to stay with somebody the kids feel comfortable with.
I've just entered an order, Ms. Sagen, regarding the transition. It appears to me that since Stephanie is at her dad's, with her dad tonight, that she's going to remain there and that custody order is going to take effect today. That there will be one visitation during the week next week and then your weekend visitations and the regular visitation schedule will then begin next Friday which is March — I'm sorry, April 3rd. So whatever day of the week you all decide for the visitation next week, whether it's the 31st, the 1st or 2nd, whatever it is —
MR. CLARK: One problem, your Honor. I believe it's Stephanie's birthday on April 1st and I think it would be appropriate if there can be some contact if the mother wants it during that day in addition to starting — CT Page 9725
THE COURT: What is planned?
MR. CLARK: I don't know if there are any plans.
MR. SAGEN: I haven't made any different plans except for a party on the 4th at my house for her and her friends.
THE COURT: Okay. Right. You made plans for a party on the 4th at your house?
MR. SAGEN: Yes.
THE COURT: On Saturday?
MR. SAGEN: Yes. That was supposed to be a regular visitation date for me.
THE COURT So I've now reversed things and messed up the thing. Why don't we do this. Why don't we say that she's going to — custody is going to — now, you say her birthday is the 1st?
MR. CLARK: First, I believe, your Honor.
THE COURT: You are having your visitation on April 1st on her birthday so that you can celebrate that with her and talk with her. That next — what time is the birthday party?
MR. SAGEN: 12 o'clock is what we said.
THE COURT: Okay. So your visitation instead of beginning on Friday next week will begin on — it will be — it will start the alternating weekends but it's going to begin on Saturday at 6:00 and that way she can show you all her presents and tell you all about the party and you can start it off having something to share other than just this decision and have something positive and then the visitation will flow from there. Okay. I don't want to mess up her birthday party.
MR. CLARK: Thank you, your Honor.
MR. MIKOLITCH: Just one question.
THE COURT: Yes, Mr. Mikolitch. CT Page 9726
MR. MIKOLITCH: That was the — you incorporated the recommendation of the family relations officer?
THE COURT: Right.
MR. MIKOLITCH: Visitation that was from the report of 4/30/96?
THE COURT: Yes.
MR. MIKOLITCH: I will give Ms. Sagen a copy of it.
THE COURT: Yes. So that what I've just done now is that next week her visitation is going to be on Wednesday, not Tuesday because it's the child's birthday, and then the alternating weekends are going to start on the 4th which is an aberration. It would have normally started on the 3rd but because of the birthday party it's going to start at 6:00 and you'll have her overnight through Sunday at 6:00. Let me just check one more thing. And then you are going to have her again on Easter day, so his visitation that weekend is going to be interrupted by Easter day and that is probably good given the transition that there's a little bit more time. Okay. All right. We're adjourned.
MR. CLARK: Thank you again, your Honor.
THE SHERIFF: All rise. The Court stands adjourned.
(Court adjourned.)
J. Gordon
 CERTIFICATE
I, Tracey L. Whidden, a court reporter for the Superior Court, Judicial District of Middletown, do hereby certify that the foregoing pages are a complete and accurate transcription of my notes taken in the matter of Gary Sagen vs. Carolyn Sagen, on March 26, 1998, before the Honorable Elaine Gordon.
Tracey L. Whidden Certified Court Reporter